# Bloomer's Appeal.

1. C. died leaving three children, Caroline, Cornelia and Charles. By his will he devised all his estate to Caroline, and imposed no conditions upon her to make any provision whatever for the other children. Caroline, however, voluntarily divided the estate, conveying one-third to her brother Charles absolutely, and declaring a trust for another third in favor of her sister Cornelia and children. The undivided half of several tracts of land was embraced in this gift to Cornelia, over which Caroline reserved personal control. Cornelia accepted the trust, but subsequently a difficulty arising with her sister she filed a bill in equity asking that Caroline be dismissed from the trust: (1) because she was living without the jurisdiction of the court; (2) unfitness to manage the trust by reason of her sex, lack of judgment and fickle temper; (3) vindictive feelings towards complainant: *Held*, that the Common Pleas, under the Act of the 14th of June 1836, had the power to remove, and properly did remove, the trustee, when she, at the time, resided without the jurisdiction of the court where the trust estate was situate, and there was nothing to show a definite purpose on her part to return.

2. *Held further*, that so far as the property contained in the gift to Cornelia had the characteristics of a strict trust, the court could remove the trustee, but as to that portion over which the donor retained personal control the court was powerless to interfere.

3. *Held further*, that the facts of this case did not show any ground for apprehension as to the safety of the trust fund, nor such harshness and vin-

[Bloomer's Appeal.]

dictiveness on the part of the trustee towards her sister as would justify her removal from the trust.

4. The court below directed the costs to be paid by the trustee: *Held*, that they should have been paid out of the trust estate.

November 6th 1876. Before Agnew, C. J., Sharswood, Mercur, Gordon, Paxson and Woodward, JJ. Williams, J., absent.

Appeal from the decree of the Court of Common Pleas, No. 1, of *Allegheny county*: Of October and November Term 1876, No. 198. In Equity.

This appeal was by Caroline Bloomer from the decree of the court, removing her from the management of a trust, declared by herself in favor of Cornelia R. Sproul and her children.

The material facts were these:—

James S. Craft, of Pittsburgh, died on the 18th of November 1870, leaving a will, wherein he gave all of his estate, consisting mainly of lands, and valued at about $600,000, to his daughter, Mrs. Caroline Bloomer. Three children survived the testator, viz., Mrs. Caroline Bloomer, a widow, Mrs. Cornelia R. Sproul, wife of Isaac G. Sproul, and Charles C. Craft.

The will of the testator, dated September 28th 1869, contained but a single clause, in these words:—

"I hereby devise and bequeath to Caroline Bloomer, my beloved daughter, all my estate, real and personal, and constitute her my sole executrix of said will, with power to sell and convey any of my real estate, and to fulfil all covenants I have made respecting said real estate, and make titles thereto according to my said covenants."

Mrs. Bloomer assumed the duties of executrix under this will, and in the fall of 1871 she voluntarily resolved to make an equal division of her deceased father's estate between her brother, sister and herself, and in pursuance of this resolution conveyed to her brother Charles 200 acres of land valued at $200,000, and on the 18th of September 1871 executed the following deed of trust in favor of Mrs. Sproul and her children, for another portion of the estate:—

"Whereas, my father, James S. Craft, Esq., deceased, died seised of certain property, real and personal; and by his last will and testament made me the sole devisee thereof; and whereas, it was understood between my father and myself, that I should hold certain property in trust for my sister, Cornelia R. Sproul, and her children, now born and that may hereafter be born. In consideration of the wishes of my father, and the natural love and affection for my sister Cornelia, and the sum of one dollar: Now, know that I, Caroline Bloomer, do hereby acknowledge, testify and declare, that I stand seised of certain property, real and personal, hereinafter described; being a part of the estate and property devised to me as aforesaid, viz.: All that certain house and lot of ground, No. 52 Ferry street, Pittsburgh, Pa., being the same purchased by James

S. Craft from John Cameron and wife, by deed dated March 31st 1870," &c.

(Here follows a description of the character and title of various properties and securities.)

" Upon the following trusts, I hold the said lands and personal property herein described for the use of the said Cornelia R. Sproul, during her natural life; I, as her trustee, to recover and receive all the rents, issues and profits of said lands and other property; and, after the payment of taxes, and all expenses of every kind or nature whatsoever, to pay over the residue of the fund yearly to said Cornelia R. Sproul, for her own separate use and benefit. At the death of said Cornelia R. Sproul, I bind myself or my successor hereinafter provided for, to execute deeds of conveyance to her said children, as they arrive at the age of twenty-one, conveying to them in fee simple, and in equal portions, the property as aforesaid; and also to transfer to them in the same manner, the personal property aforesaid; and in case of the death of said children or any one of them, the issue of such deceased child or children shall receive the portion the parent would have received if living. But if the said Cornelia R. Sproul should make a will, then the property aforesaid shall be conveyed to her children or their issue, in such proportions and in such a manner as she shall indicate and provide for in any writing in the nature of a last will and testament; with the proviso, however, that I may at any time, at my own absolute discretion, sell and convey the lands and property hereinbefore mentioned, or any part thereof, and make deeds for the same whenever it may to me seem desirable (this power to be personal to myself, and not to be exercised by any other trustee under this declaration); and I hereby bind myself to invest the money arising from any such sale, and to hold it subject to the purposes of this trust, just as the land was held. And it is part of the consideration of this declaration that I am not to be liable or responsible for any losses that may arise from the management of this trust property while I remain trustee. The personal property hereinbefore described is subject to the payment of one-third part of any claim or claims that may be recovered against me, as the executrix of the estate of James S. Craft, deceased, after the execution of this declaration of trust. In case of my death or resignation, the Orphans' Court of Allegheny county, state of Pennsylvania, may appoint a trustee to carry out the provisions of this trust."

Mrs. Bloomer was the favorite child of the testator, and he had great confidence in her discretion and business capacity. No promise was exacted from her by the testator, that she would make any disposition of his property such as she did make or any other. It appeared Mrs. Bloomer knew what the wishes of her father were, but he never made them known to other parties. From conversations the testator had with Mrs. Bloomer and third parties, it was

to be inferred, that after his death there should be a division of his estate, but what should be the nature and value of the shares of the several children was left to Mrs. Bloomer alone to determine.

·Mrs. Sproul frequently expressed her gratitude for and entire satisfaction with the declaration of trust from the time of its execution up to within a short time before this controversy began. She accepted and acted under a power of attorney from Mrs. Bloomer as trustee, and received and used the income of the trust estate for a period of about two years. The relations between the trustee and the *cestui que trust* and her husband were very friendly. Even up to December 29th 1873, she spoke of Mrs. Sproul as her " dear sister," and of Mr. Sproul as a " dear kind brother."

In December 1873, the first sign of dissatisfaction appeared, and that related to the management of the trust funds. Mrs. Bloomer claimed the absolute control of the corpus of the trust estate, and the right to invest wherever she pleased. She proposed to buy mortgages in Washington city, which she said would pay a higher per centage, and be under her own eye. To this course Mr. Sproul objected. He denied the alleged right to remove any part of the trust funds out of the jurisdiction of the court. Mrs. Bloomer appears to have taken this in good part, but Mrs. Sproul became alarmed and consulted counsel with reference to the matter. The opinion given was enclosed by Mrs. Sproul in a letter to Mrs. Bloomer, in which she alluded to the enclosure, and indicated her intention to follow the advice therein contained, to have a resident trustee appointed.

With this letter there commenced an angry and bitter correspondence between the sisters, wherein many harsh and intemperate charges were mutually made, and finally, on the 3d of January 1874, a bill in equity was filed by Isaac G. Sproul and his wife, in the right of the wife, which complained, in brief, that the devise of Mr. Craft to Mrs. Bloomer was upon the understanding and promise that the latter would divide his estate equally between the children ; that the part of Mrs. Sproul embraced in the deed of trust made by Mrs. Bloomer was not the just portion of Mrs. Sproul in said estate, and was a contrivance of Mrs. Bloomer to retain dominion over said portion ; that Mrs. Sproul accepted said declaration of trust in ignorance of the true value of her deceased father's estate, and in the fear that her refusal would impose harder conditions upon her ; that Mrs. Bloomer had removed from the state and was no longer a resident thereof ; that complainant had asked Mrs. Bloomer to relinquish said trust, and consent to the substitution of a new trustee or the appointment of some one, a resident of the state, to act in conjunction with her, which had been refused in a harsh and insulting manner ; that Mrs. Bloomer, by reason of her sex, lack of prudence and judgment, and her fickle temper, was unfitted for the management of said trust, and conse-

quently said trust estate was in peril of waste; that the bulk of said estate was in Allegheny county; that $100,000 of said estate consisted of personalty yielding income, and a large portion of the real estate yielded income, and that Mrs. Bloomer claimed the right to invest the same where and in what manner she thought proper, and intended to remove said fund beyond the jurisdiction of the courts of Allegheny county.

The prayer was,

That an account be taken, and that Mrs. Bloomer be decreed to pay to said Cornelia her just proportion of said estate according to the true intent of the trust arrangement with the testator; that the declaration of trust be annulled, the trustee dismissed, and a new trustee appointed or one to act with her, or that she be required to give security for her fidelity, and that meantime a receiver be appointed, and said trustee be enjoined from interfering with said trust.

A receiver was appointed and the injunction issued, and Mrs. Bloomer filed an answer, wherein she, in effect, denied that said estate was devised to her under any promise that she would divide the same between the children; that the conveyance to Charles and the declaration of trust were in pursuance of any such understanding with her deceased father; that her sister was in ignorance of the true value of the estate, or was constrained to accept the declaration of trust; admitted that she had purchased and occupied a house in Washington, D. C., and intended to remain in that city until her son was educated, but denied that she had any intention to change her residence; averred that her sister had written her a letter charging respondent with falsehood, and she was thereby provoked into using the language she had towards her; admitted that the greater part of the estate was in Allegheny county, and that there was a large income from the estate, but averred that every dollar had been accounted for, and further, that all the trust fund that ever was in Allegheny county was still there, and the respondent did not contemplate changing the investments therefrom; and further, that there could be no question of respondent's solvency.

The bill and answer were referred to a master to take testimony and report.

Before the master there was evidence to rebut the averment that the trustee was incompetent. The attorney for the trust estate testified that he considered the capacity of the trustee to do business wonderful, and that as far as he could see she had managed the trust property with great care and conscientiousness.

It was also shown that the appellant was worth from three to four hundred thousand dollars, and that she had increased her own estate about sixty thousand dollars since it came into her hands.

1 NORRIS—4

It was also claimed that the removal of the estate from her hands would be a serious loss to her; that she held in common with the trust estate, a large amount of real estate, about seventy thousand dollars worth of coal on the Monongahela river, near Pittsburgh, and that there was but one entrance to this coal from the river. Real estate brokers were called, who testified that this coal could only be sold together, that the appellant could not sell her individual interest for one half its value.

The record showed that a great part of the costs in this suit arose from the efforts of the appellee to destroy the trust instrument.

No fraud or breach of trust was averred in the bill, and no evidence was offered to show that the appellant had not accounted for every dollar contained in the declaration of trust, and the income therefrom.

It was contended by the appellant before the master that this trust instrument was a voluntary executory contract, to pay the appellee the proceeds of certain property; that under its general and *specific* stipulations, the donor or settlor was to retain possession of the property named until she died or resigned. That the donee took the income only upon the *express condition* that the donor was to hold and manage the property during her life or until she resigned; that the right of possession has never passed from her, that she did not hold this right in trust for any one, that it was a part of her dominion reserved to herself and a court of equity would violate her rights by taking it from her.

Five issues were raised by the bill and answer, which are herewith given, together with the findings of the master thereon, after a review of the testimony.

1. Whether James S. Craft devised his estate to Mrs. Caroline Bloomer on the "distinct understanding or promise" that she would divide and distribute said estate justly and equally between herself, her brother Charles, and her sister Cornelia, the plaintiff.

2. Whether the declaration of trust executed by Mrs. Bloomer in favor of Mrs. Sproul and her children was in pursuance of such understanding or promise and was voluntarily accepted by Mrs. Sproul.

Upon these two issues the master found in favor of the validity of the trust declared by Mrs. Bloomer for the benefit of Mrs. Sproul and her children, and that they were bound thereby.

3. Whether Mrs. Bloomer has removed her residence out of the state of Pennsylvania.

Upon this the finding was:—

"The master is of opinion and finds that Mrs. Bloomer has so moved her residence. She purchased, furnished and made extensive improvements in and about a house in Washington city, and has occupied it for nearly three years. This is not consistent with the idea of a mere temporary residence, and especially so when

[Bloomer's Appeal.]

taken in connection with the fact that we hear nothing of an intention to return to Pittsburgh, until this litigation began."

4. Whether the conduct of Mrs. Bloomer raises just apprehensions as to the safety of the trust funds.

Upon this the finding was:—

" In view of the character of her testimony, of the spoliation of the books relating to the trust estate in anticipation or during the pendency of litigation, with an evident design to conserve her own and prejudice Mrs. Sproul's interests, and of her open defiance to the order of this court, the master is of the opinion that there is just ground for apprehension as to the safety of said funds."

5. Whether Mrs. Bloomer has shown such harshness and vindictiveness towards Mrs. Sproul as to disqualify her from acting as trustee.

The finding was, in substance: "Without provocation Mrs. Bloomer charged Mrs. Sproul with impertinence and falsehood and made other grave charges against her character. She declared that she would hold on to the trust until she had shown Mr. and Mrs. Sproul that they were powerless to interfere with her; that Mrs. Sproul could never have a place in her heart again nor would she again address her as sister; that she would follow her to the end if it took all of Mrs. Sproul's income to do so; she even endeavored to prevent the receiver from paying Mrs. Sproul any part of the income to which she was entitled. Here," continued the master, " is the very essence of harshness and vindictiveness, affecting not only the intercourse between the trustee and *cestui que trust*, but endangering the trust itself by prolonging litigation."

The master further found that Mrs. Bloomer had precipitated these proceedings by her harshness and vindictiveness, and was therefore in fault and should pay the costs.

To the third, fourth and fifth findings of the master Mrs. Bloomer excepted, but subsequently the court overruled the exceptions, confirmed the report and made a decree discharging Mrs. Bloomer from the duties of the trust, and appointing a trustee in her stead, and directing her to pay the costs of this suit.

From this decree this appeal was taken.

*George Shiras, Jr.*, and *A. S. Fuller*, for appellant.—The appellant clearly intended in this trust instrument to reserve to herself the right to hold and manage the property donated, during her life or until she voluntarily relinquished her power over it; and the intent is the only guide for its construction: Brailsford *v.* Heyward, 2 Dessaussure 292; 1 Fonblanque's Equity 339, n. In all grants and covenants to stand seised, nothing passes from the grantor by implication. In this instance there is a specific reservation of the right to hold and manage the property. This portion of the donor's title has never passed from her.

[Bloomer's Appeal.]

" There is a difference between a power reserved to a stranger and to the owner himself. A power over a man's own estate is a parcel of the dominion reserved to himself, and voluntary, and therefore shall be expounded favorably :" 2 Fonblanque's Equity 162. The power in this instance is made an express condition in the contract. It is precedent, for the donee must accept this condition before she can take anything under the agreement.

The Acts of Assembly authorizing the removal of trustees for non-residence, do not apply to a case of this kind. The trusts contemplated by them are those technical trusts where property is conveyed to one for the use of another, but a trust under an agreement by one to hold for another until a certain time is not such a trust.

The question of residence is a question of intention. " Residence is presumed to continue where it has been until a change is affirmatively shown, or at least until there is satisfactory evidence of abandonment :" Matter of Nichols, 54 N. Y. 62, and cases cited in Fry's Election Case, 21 P. F. Smith 302.

The reserved power of sale here cannot be taken from the settlor because it is coupled with an interest, a large portion of the real estate being held in common by the settlor and the trust estate.

The larger portion of the costs were incurred from the effort of the appellee to destroy the trust instrument, and should not be imposed upon appellant.

*George P. Hamilton,* for appellee.—By Act of 16th June 1836, sect. 1, Purd. Dig. 589, courts of equity in this state have the power of " control, removal and discharge of trustees." The power is general and may be exercised whensoever the welfare of the trust estate would seem to require it.

It is exercised on the broad principle that in legal contemplation trusts are created for the benefit of the beneficiary, and not for the trustee, and that courts of equity will not permit trusts to fail in whole or in part by the conduct of the trustee.

The security of the trust estate, and the due execution of the trust, depend largely on the jurisdiction of the court where the trust is created, or where the body of the estate is, over the person of the trustee. Hence, in England and in this country, where the trustee removes beyond the jurisdiction, it is considered a good ground of removal, and the appointment of a new trustee, without regard to whether the trustee is self-constituted or appointed by another, or how the trust has been created.

Where one of several trustees is out of the jurisdiction, the court will appoint a new trustee in his place, " although he has a direct beneficial interest in the subject of the trust :" Hill on Trustees (side page) 206.

The power of alienation reserved to appellant personally, like all

other powers in a trust deed which are not coupled with a beneficial interest in the subject of the trust, are presumed to be for the benefit of the beneficiary, and cannot be used to her prejudice.

Moreover, the power in question is not of the essence of the trust, but relates solely to the mode of exercising it, and it is a rudimental rule in all such cases, that the trust shall control the power, and not the power the trust.   Courts will not allow trusts to fail for want of a trustee, or to be perverted, impaired or destroyed by the agency of the trustee.

The Act of 14th June 1836, sect. 16, Purd. Dig. 1417, provides for the case where a trustee is " about to remove out of the Commonwealth."   Sect. 20, Id., provides for the case where a trustee or assignee " shall have removed from the state, or ceased to have a known place of residence therein for a year or more."

In both contingencies the act declares that it shall be lawful for the court to dismiss such assignee or trustee.

The Act 1st May 1861, sect. 59, Purd. Dig. 1424, authorizes the court to dismiss a trustee where the interests of the estate or property under his charge are likely to be jeopardized, for any reasons by the continuance of such trustee.

Mr. Justice WOODWARD delivered the opinion of the court, January 15th 1877.

In passing on the questions in issue here, it has been felt to be the duty of this court to make every intendment the record would permit in favor of the appellant.   By her father's will, the whole of his estate was vested in her, and she was clothed with unlimited discretion in settling the fortunes of his other children.   The exercise by her of this discretion in the provision made for her brother and sister, was disinterested and generous as well as just. Until the unhappy breach in her relations with Mrs. Sproul occurred, the trust appears to have been faithfully administered, and the rights of the *cestuis que trust* are amply secured by the private estate of which the appellant is possessed.

Governed by this general view, it was believed throughout the argument and in the subsequent consideration of the cause, that the final decision of the master was erroneously based on the facts he found to be established by the evidence.   The character of the defendant's testimony, what was termed " the spoliation of the books of the trust estate," and her alleged open defiance of the order of the court, were held sufficient to warrant apprehension of danger to the interests in her hands.   It would be a very hard rule that would require the character of a party to an angry legal contest to be tried by the results of a long and close examination respecting large and diversified property interests in which intricate details had been involved.   The " spoliation of books" was the destruction of accounts and memoranda of which duplicates in the possession or reach

of the appellees were in existence. The act put no part of the
trust estate at hazard, and can readily be attributed to ignorance
and inexperience. In the course taken by her while the litigation
was pending, it is to be assumed that the appellant acted under the
advice of counsel. Nor was what the master regarded as the harsh-
ness and vindictiveness of the appellant towards Mrs. Sproul believed
to be a justification of the final decision. The facts disclosed in this
connection grew out of the suit while it was in prospect and in pro-
gress. The state of feeling shown by the testimony to have ex-
isted between these parties is greatly to be deplored. The existence
of evil temper that exhibits itself in evil deeds or explodes in evil
speech, is always deplorable. But the bitterness of family feuds is
proverbial. Men and women suffer themselves to speak to or of
relatives from whom they differ—especially near relatives—in a
manner they never adopt in speaking to or of strangers. And the
master made too much account of perhaps natural demonstrations
of a temper subjected by the exigencies and incidents of this suit
to unwonted strain.

It was thought also the evidence did not warrant the finding that
the appellant had removed from Pennsylvania. And it is still be-
lieved that the purchase and occupation of a house in the city of
Washington, without more, would not, even where a man might be
the head of a family, be enough to imply the intention of a change
of domicile. Multitudes of families not even indirectly connected
with the business of the national government, live there for years,
and if a profession is not pursued nor a business undertaken,
the presumption to be rebutted is that the residence is tempo-
rary, and not that it is permanent. Looking into the evidence,
however, it is found that there is nothing to show a definite pur-
pose on the part of the defendant to return to Pennsylvania. In
her answer she denied that she intended to acquire a new resi-
dence, but she stated that she had purchased a farm in West Vir-
ginia at the request of her son, to whom she designed to convey it
at his majority. She added that she would probably remain in
Washington until her son should finish his education. This indi-
cated at least a protracted absence and an indefinite return. The
20th section of the Act of the 14th of June 1836, makes it lawful
for the court having jurisdiction to remove a trustee who " shall
have removed from the state or ceased to have a known residence
therein for the period of a year or more." Upon the facts disclosed
in the evidence, it cannot be said that there was error to warrant
a reversal on this ground in the decision of the master and the decree
of the Common Pleas.

It remains to inquire to what extent the decree ought to be car-
ried out. So far as the property dedicated by the appellant to the
use and benefit of Mrs. Sproul and her children was subjected to
the characteristics of a strict trust, it was within the jurisdiction of

the court below, and their action will have to be left undisturbed. But there were portions of the estate in which the appellant expressly retained contract rights, and over which she reserved exclusive personal dominion. The undivided half of several tracts of land was embraced in the gift to Mrs. Sproul. After defining the trusts on which the property should be held, the deed proceeded in these words : " With the proviso, however, that I may at any time, at my own absolute discretion, sell and convey the lands and property hereinbefore mentioned, or any part thereof, and make deeds for the same whenever it may to me seem desirable (this power to be personal to myself, and not to be exercised by any other trustee under this declaration) ; and I hereby bind myself to invest the money arising from any such sale, and to hold it subject to the purposes of this trust, just as the land was held." It is manifest from the language of this proviso that the reservation of control over property by the appellant was intended to be confined to land. That it was intended also to be confined to the land of which she was a tenant in common, was shown by her statement in the answer to the bill. " I reserved powers to myself," she declared, " because they are necessary to the full enjoyment of my own property. Under said declaration of trust, my sister and myself are tenants in common of about $100,000 worth of real estate. I reserve the absolute power to sell at my discretion her share of this property, because much of it is coal property, and is of a nature that it would only sell to advantage by being sold together. There are several pieces of property out of the state of Pennsylvania in the same position, and I was not willing to part with this power or divide it with others." When the trust was declared, the master has found that the appellant held the absolute title to the whole of her father's estate. In divesting herself of any part of that title, it was competent for her to impose any conditions she might deem expedient upon the property transferred. In effect, the deed made her the trustee of any moneys she should receive from the real estate held in common after it should be sold. All she bound herself to do respecting that property was to hold the money arising from its sale " subject to the purposes of the trust." She thus retained a control over and an interest in this part of the property described in the declaration, and with that the court, under the powers conferred on them by the statute, were not authorized to interfere. Under the facts found by the master, this deed is subject to the rules that govern voluntary grants. It is to be construed as to the grantee according to its strict terms, and so as to effectuate the intention of the grantor. While the residue of the estate described in the declaration of trust will have to be transferred to the control of a new trustee under the decree of the court below, the lands held in common must be left in the appellant's hands until the present situation of the parties and property shall

be in some way changed.   The right to retain the management of this property, however, is subject to the duty on the part of the appellant to give adequate security for the faithful discharge of the duties which the deed imposed.   She is found by the master's report to be resident out of the state, and the *cestuis que trustent* have the right to demand protection, not only against ordinary hazards, but against the consequences of absence and neglect.

The imposition of the costs on the appellant, even in view of the equities of the case as they were adjusted by the master and the Common Pleas, was by the application of a rule unduly harsh. There had been no breach of trust, no waste, mismanagement or misappropriation of the trust funds, and no such misconduct as to make the suit necessary to protect the interests of the appellees. The appellant had the right to defend herself against the attempt to oust her from the control of the common property, and under all the circumstances surrounding the parties, the costs should have been directed to be paid out of the trust estate.

And now, to wit, 15th January 1877, it is ordered and adjudged that so much of the decree of the Court of Common Pleas as discharged the defendant, Mrs. Caroline E. Bloomer, from the management and control of the lands described in her declaration of trust in which she owned an undivided interest, and so much thereof as directed the payment of the costs before the master and in the Common Pleas, be reversed ; and that the said costs be paid out of the estate belonging to the plaintiffs in the defendant's hands.   And it is further ordered and adjudged that the said defendant, Mrs. Caroline E. Bloomer, give bond in a sum to be fixed and with sureties to be approved by the said Court of Common Pleas, conditioned for the faithful discharge of her duties as trustee of the undivided half of the real estate of which she retains control, and for the faithful payment of the rents, issues, profits and proceeds of sale thereof; and that the record be remitted in order that this proceeding may be had.   The residue of the decree of the Common Pleas is affirmed, and it is ordered that the costs of this appeal be paid by the appellees.